Ronald Ryan
Ronald Ryan PC
Attorney for Debtors
1413 E. Hedrick Drive
Tucson, AZ 85719
(520)298-3333 ph 743-1020 fax
ronryanlaw@cox.net
AZ Bar #018140 Pima Cty #65325

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ARIZONA, TUCSON DIVISION

| | |
|---|---|
| **IN RE:**<br>**JOHN MADERO AND ARMIDA**<br>**MADERO, DEBTOR**<br><br>_____<br><br>**U.S. BANK NATIONAL ASSOCIATION,**<br>**AS TRUSTEE FOR**<br>**CITIGROUP MORTGAGE LOAN TRUST**<br>**2006-HE3, MOVANT**<br><br>**VS.**<br><br>**JOHN MADERO AND ARMIDA**<br>**MADERO, DEBTOR** | Case # **4:08-bk-06436-EWH**<br><br><br>**DEBTOR'S RESPONSE TO MOTION**<br>**FOR RELIEF FROM STAY, FOR**<br>**FINDING OF CAUSE TO MAINTAIN**<br>**THE STAY PENDING RESPONSES TO**<br>**DISCOVERY AND SUBSEQUENT**<br>**FINAL HEARING AND FOR DEBTOR'S**<br>**ATTORNEY'S FEES PLUS**<br><br>Chapter 13 |

COMES NOW, JOHN MADERO AND ARMIDA MADERO, Debtor, and files this

Debtor's Response to Motion for Relief from Stay, for Finding of Cause to Maintain the Stay

Pending Responses to Discovery and Subsequent Final Hearing and for Debtor's Attorney's

Fees Plus, filed by U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR

CITIGROUP MORTGAGE LOAN TRUST 2006-HE3, Movant, and present unto the Court

as follows:

This chapter 13 case was commenced by the filing of a petition on **6/02/2008.** There

will shortly be an adversary proceeding filed to deem the mortgage in question unsecured,

at a minimum, and which will object to the claim. Pursuant to B.R. 3007(b), an Objection to Claim may be included in or filed as an Adversary Proceeding. **A Brief in Support of this Response and in Support of the Adversary will also be filed shortly. The contents of this Response, the Adversary Proceeding Complaint, and the Brief in Support thereof, should all be considered as supporting each other, as if set forth at length herein, and vice versa.** The issues are complex and this Response, which attempts to summarize the main themes pertinent to a Stay Relief Motion, could provide more detail and go deeper into the issues, but it would be too lengthy. Debtor can present an affidavit from an expert witness that will support Debtors allegations herein such that sufficient cause is shown to hold the stay in place until the evidentiary hearing which must come after discovery is responded to. Though Movant has the burden of proof on the issues as set forth below, if Movant attempts to present documents showing it to the holder in due course, discovery responses are necessary so that Debtor can show that this claim is misleading and false. Additionally, since the note is unsecured and the mortgage has been rendered a nullity, there is no arrearage, and therefore the conduit payment rule is inapplicable. These are being made to show that Debtor can afford a reasonable payment in case the case is resolved by a settlement that would include a hold harmless clause, to guard against the possibility that another entity would show up at a later date and claim to be the real party in interest.

Debtors have a fundamental right to avoid collection actions, including foreclosure, during the pendency of bankruptcy:

> The automatic stay is ***one of the fundamental debtor protections*** provided
> by the bankruptcy laws. It gives the debtor a breathing spell from his
> creditors. It stops all collection efforts, all harassment, and all foreclosure

actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

*Dawson v. Wash. Mutual Bank, F.A.* (In re Dawson), 390 F.3d 1139, 1147 (9th Cir. 2004) (quoting H.R. Rep. No. 95-595, at 340 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6296-97). Emphasis added. It was not intended to be a summary procedure if inappropriate to the facts of the case. Although the foreclosure stay can be lifted when a homeowner is unable to make mortgage payments, it is critical that borrowers not be deprived of such a fundamental protection of bankruptcy without solid evidence that the creditor is entitled to proceed. As a New Jersey bankruptcy court held in reviewing problematic certifications filed as part of lift stay motions, "notwithstanding the volume, pace and electronic systemizing of stay relief motions and applications, this court must remain mindful of the serious stakes—most often it is the family homestead that is in jeopardy. . . . [B]oth the data supplied and the verification processes employed by those who would foreclose on residences ***must be above reproach***." In re Rivera, 342 B.R. 435, 441 (Bankr. D.N.J. 2006) (emphasis added). This Court should apply the same standard.

Movant, U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR CITIGROUP MORTGAGE LOAN TRUST 2006-HE3, is not a real party in interest and also does not have standing to bring this motion. In the Assignment of Deed of Trust (DOT) that was recorded on behalf of MERS, it purports to assign the October 6, 2006, DOT to Movant on October 10, 2009.[1] The sworn acknowledgment on the Assignment was executed in Cobb County, Georgia under penalty of perjury, and purported to assign the DOT and all interest

---

[1] Exhibit A Assignment of Deed of Trust.

in the underlying Note, by John D. Schtotter, who it states he was is the "Vice President" for Mortgage Electronic Registration System, Inc. First, John D. Schtotter, is an Attorney and Partner with the Law Firm of McCalla Raymer, LLC Suite 3200, Six Concourse Parkway Atlanta, Georgia 30328, according to Martindale-Hubbell.[2] Apparently, he is both Vice President of both MERS and a partner in a nationwide law firm. Movant is not the owner and holder of the Note. The note was securitized and is Pooled into a Mortgage Backed Security ("MBS") Trust, and the ownership thereof are a large number of unnamed parties. Second, Trustees for MBS Trusts have no authority to act on behalf of the Investors. Third, MERS has no power to assign notes, generally, and certainly not in this case. *Landmark v. Kessler*, 98,489, p. 11 (KN S.Ct. 2009),[3] citing *LaSalle Bank Nat. Ass'n v. Lamy*, 2006 WL 2251721, at *2 (N.Y. Sup. 2006) (unpublished opinion) ("A nominee of the owner of a note and mortgage may not effectively assign the note and mortgage to another for want of an ownership interest in said note and mortgage by the nominee."). Because MERS was not the original holder of the Note and there is nothing in the record to show that MERS was ever assigned the Note, it has no power to assign the Note.

> "MERS never held the promissory note, thus its assignment of the deed of trust to Ocwen separate from the note had no force." 284 S.W.3d at 624; see also *In re Wilhelm*, 407 B.R. 392 (Bankr. D. Idaho 2009) (standard mortgage note language does not expressly or implicitly authorize MERS to transfer the note); *In re Vargas*, 396 B.R. 511, 517 (Bankr. C.D. Cal. 2008) ("[I]f FHM has transferred the note, MERS is no longer an authorized agent of the holder unless it has a separate agency contract with the new undisclosed principal. MERS presents no evidence as to who owns the note, or of any authorization to act on behalf of the present owner."); *Saxon Mortgage Services, Inc. v. Hillery*, 2008 WL 5170180 (N.D. Cal. 2008) (unpublished opinion) ("[F]or there to be a valid assignment, there must be more than just assignment of the

---

[2] See Exhibit B.

[3] http://www.kscourts.org/Cases-and-Opinions/opinions/supct/2009/20090828/98489.htm

deed alone; the note must also be assigned. . . . MERS purportedly assigned both the deed of trust and the promissory note. . . . However, there is no evidence of record that establishes that MERS either held the promissory note or was given the authority . . . to assign the note.").

Neither MERS nor Movant has presented evidence of who really owns the Note. Fourth, the documents in this case look like one of the common scenarios seen in many cases, which will be elaborated in the Adversary Complaint and Brief to be filed. O. Max Gardner, III, well-known securitized mortgage expert, refers to this common scenario as the A to D alphabet problem. In the most basic securitized structure, transfers of the note ownership are in order, the A (Originator), B (Sponsor), C (Depositor) and D (Trust), and to comply with the law of and with the Pooling & Servicing Agreement (PSA) and the federal law applicable to Real Estate Management Investment Trusts (REMICs), the Note must make it to the Trust prior to the closing date, or within the three months thereafter if there is a fixed-price contract in effect on the startup date. There is generally a very small window from loan origination to the closing date. A review of the cases reveals a massive volume of transfers and assignments executed long after the "Closing Date" for the Trust from the "Originator" Directly to the "Trust." Gardner refers to these documents as "A to D" transfers and assignments. There are some serious problems with the A to D documents. First, at the time these documents are executed the a party has nothing to sell or transfer since the transfer had to have occurred years ago. To comply with federal law as to REMICs, the Notes must be sold to the MBS Trust within 90 days after execution by borrower. The documents completely circumvent the primary objective of securitization by ignoring the "true sales" to the Sponsor (the B party) and the Depositor (the C party). In a true securitization, you would never have any direct transfers (A to D) from the Originator to the

Trust.  This is because one primary purpose, at least at the marketing stage, of securitization is to make sure the assets (e.g., mortgage notes) are both FDIC and bankruptcy "remote" from the Originator, in the event the Originator files for bankruptcy or is taken over by the FDIC.  These A to D transfers are totally inconsistent with the representations and warranties made in the PSA to the Securities and Exchange Commission and to the holders of the Bonds (the "Certificateholders") issued by the Trust. In this scenario, it is common for the A to D documents to be executed by parties who are not employed by the Originator but who claim to have "signing authority" or some type of "agency authority" from the Originator, as MERS, or the McCalla Raymer does in this case. In many of these A to D document cases the Originator is legally defunct at the time the document is in fact signed.  In fact, New Century is defunct, having gone into bankruptcy April 2, 2007, and it was found to have engaged in widespread fraud and abuse.[4]

> Auditor KPMG KPMG.UL either initiated accounting fraud at New Century Financial Corp NEWCQ.PK or stood idly by as the failed subprime mortgage lender committed fraud in 2005 and 2006, an independent report requested by the U.S. Department of Justice shows. Once the second-largest U.S. subprime lender, New Century filed for Chapter 11 bankruptcy protection last April 2, . . . The 581-page report by court examiner Michael Missal concluded that New Century "engaged in a number of significant improper and imprudent practices related to its loan originations, operations, and financial reporting." . . . Such controls might have caught "at least seven "wide-ranging, improper accounting practices", most of which were not in accordance with generally accepted accounting principles, Missal said. . . New Century was already underestimating these coming payments when KPMG professionals suggested a new scheme that not only violated the accounting industry's Generally Accepted Accounting Principles but also exacerbated the situation.  "This is really the origin of the credit crisis," Missal concluded.

---

[4] Exhibit C.  *KPMG allowed fraud at New Century, Report says* (Reporting by Amanda Beck, editing by Peter Henderson & Kim Coghill), © Thomson Reuters, Mar 27, 2008, http://www.reuters.com/articlePrint?articleId=USN2631813920080327

In any event, there is here as in almost every case a lack of candor to the Court and to Debtor, because the transfers of the Note between at least four parties in the securitization process have not been disclosed and in this case. And it has not been disclosed how Movant and/or New Century and/or MERS was able to circumvent federal securities and federal income tax laws, by not transferring the Note into the Trust in 2006, as is required by law.

Movant is not the original investor, and is not the real party in interest. The note was securitized. Borrowers have a right to know who is the owner of their Note at all times.[5] Debtor, NACBA and an increasing number of Bankruptcy Courts are rethinking deeply the traditional way of thinking about Motions for Relief from Stay, and even maintenance of the payments in the full monthly amount in the original Note during the pendency of litigation. Though it is important to maintain payments, it is more important that if payments are continued it is to the correct party. The fact that the owner is or was a MBS Trust, and the exact identity of that Trust Pool and all of the intermediary Participants is claimed by the Participants and MERS to be a confidential secret, which among all of the other things that MBS Participants and MERS routinely do, casts everything in doubt. Now all of the sudden, the Note is magically assigned into the MBS Trust in this case on 10/13/2009. No party should be permitted to be taken seriously with a stay relief motion until they disclose and prove the chain of transfer of the Note and the chain of consideration from Origination to the Trust, complete with dates and amounts. A far closer **approximation** of this information

[5] Credit for much of this paragraph goes to *Amicus Curiae National Association of Consumer Bankruptcy Attorneys* filed in the Nevada multi-case MERS Decision now on appeal, in re Mitchell (designated as the lead case for Motions to Lift Stay filed by MERS in 28 cases), Memorandum Opinion, BK-S-07-16226-LBR, (Bky. D.NV. 2008).

is available to every Participant and MERS in less than five (5) minutes of internet time through their user name and password on the MERS website. **Debtor urges this Court to establish a standing order that any party filing a motion for relief from stay or a proof of claim must file as an exhibit all printouts available to it as a member of MERS, which all Movants that appear before the Court are. By merely going online and entering their user name and password, they have access to a wealth of information as to alleged ownership of the Note historically from the inception as well as the transfer of servicing rights**. Attached hereto is an example of a MERS printout, obtained from one of the Participants in another case, that shows that the primary mortgage loan in another case is owned by the investors in a MBS Trust of which U.S. Bank is the Trustee.[6] In that case, Aurora Loan Services LLC represented to the Court as follows, "Aurora Loan Services, LLC is now the holder of the Note that is Secured by the Deed of Trust and is the real party in interest." To this very date, Aurora has not come clean, and this is tantamount to a fraud on the Court and to Debtor. Rather than this being the exception, this type of fraud is common. A mortgagee or a beneficiary to a deed to trust is entitled to only one satisfaction of his debt. A deed of trust typically secures a debt owed the beneficiary. Systems employed by MERS, TradeWeb's TBA-MBS Marketplace, and others, and other practices that have similar effects, have become commonplace disrupt this well settled system by hiding from the Borrower who owns the beneficial ownership interests in the loan. It has not become the universal practice of keeping secret the true identity of the actual investor, or owner of the Note, and all the transfers, and additional

---

[6] EXHIBIT D.

accounting beyond a mere record of payments made by the borrower, that takes place in securitization and otherwise. MERS is a recent creation of the mortgage industry. It was incorporated in October 1995, with the Mortgage Bankers Association as a charter member. R.K. Arnold, *Yes, There Is Life on MERS, Prob. & Prop.*, Aug. 1997, at 33.2.[7]  The laws of every state, including Arizona, provide for the public recordation of assignments of beneficial interests in deeds of trust. MERS was created for the express purpose of facilitating the trading of mortgage rights "electronically among its members without the need to record a mortgage assignment in the public land records each time," Arnold, supra, at 33; see also Phyllis K. Slesinger & Daniel Mclaughlin, *Mortgage Electronic Registration System*, 31 Idaho L. Rev. 805, 806 (1995) (noting the mortgage industry sought to create its own private "central, electronic registry for tracking mortgage rights" that allows "participants in the lending industry . . . to obtain, transfer, and identify interests in mortgages essentially on a real time basis") In effect, MERS acts as a privatized county recorder's office for the purpose of facilitating the sale of home loans on the secondary market. Under the MERS system, mortgage originators, lenders, servicers, and investors "register" their loans with MERS. secured property is located.  The creation of MERS was meant to facilitate the burgeoning volume of mortgage loan transfers that were occurring "[a]s investors bought more and more loans in the secondary market." Arnold, supra, at 34; see also Slesinger & Mclaughlin, supra, at 812. Before the burst of the housing bubble, Wall Street firms had met this investor demand by creating "mortgagebacked securities" that gave investors rights to receive payments from thousands of mortgage loans that had been

---

[7]  The author of this article was general counsel of MERS, and is now its President and CEO, according to official public records.

pooled together. In assembling the thousands of mortgage loans, each and every individual loan was subject to a series of transfers. At a minimum, lenders had to assign ownership of each loan in the pool to a trust that held the loans on the investors' behalf. See Peterson, supra, at 2206-09; Kathleen C. Engel & Patricia A. McCoy, *Turning a Blind Eye: Wall Street Finance of Predatory Lending*, 75 Fordham L. Rev. 2039, 2045-46 (2007). While ownership of the loans was transferred to these trusts, the trusts typically contracted with "servicers" to collect payments from and handle communications with borrowers. See 12 U.S.C. § 2605(e), (i)(2)-(3) (defining "servicer" for purposes of the Real Estate Settlement Procedures Act and setting forth duties of the servicer). Borrowers facing foreclosure need to know who owns their loan. The fact is that MERS and all participant hide the name of the current loan owner when filing motions to lift the bankruptcy stay. Courts have also noted that keeping loan owners' identity out of the public record adversely affects public policy research. See *MERSCORP, Inc. v. Romaine*, 861 N.E.2d 81, 85 (N.Y. 2006) (Ciparick, J., concurring) ("MERS's success will arguably detract from the amount of public data available concerning mortgage ownership that otherwise offers a wealth of statistics that are used to analyze trends in lending practices."). Similarly, keeping loan owners' name out of the bankruptcy courts' electronic dockets may thwart the usefulness of bankruptcy records in informing public policy related to lending. See Katherine Porter, *Misbehavior and Mistake in Mortgage Bankruptcy Claims*, 87 Tex. L. Rev. 121 (2008) (reporting on home lending research based on filings in 1,700 bankruptcy cases); see also 11 U.S.C. § 107 (providing public access to bankruptcy records). Congress has recently recognized the problems created for borrowers when they do not know who owns their loan and the strong public interest in having this information disclosed. The *Helping Families Save Their Homes*

*Act of 2009* requires that loan owners notify borrowers about all future transfers in ownership. Section 404 of the act provides that "not later than 30 days after the date on which a mortgage loan is sold or otherwise transferred or assigned to a third party, the creditor that is the new owner or assignee of the debt shall notify the borrower in writing of such transfer." Pub. L. No. 111-22, 123 Stat. 1632, 1658 (codified at 15 U.S.C. § 1641(g)(1)). As Senator Boxer, the author of this provision, stated on the Senate floor: [I]f you are in trouble and you want to renegotiate your mortgage, you need to sit down with the company that holds your note. That is all we do in this amendment. . . . It seems like a no-brainer to me. Clearly, the law needs to be made explicit because, frankly, the people who hold the mortgages seem to go into hiding and you cannot find them when you want to find them. 155 Cong. Rec. S5173 (daily ed. May 6, 2009). MERS, and the prevailing system of secrecy, in effect with or without MERS, should not be allowed to use the bankruptcy courts to further what Congress has determined to be an unacceptable practice of hiding the identity of loan owners.[8]

The failure to disclose the real owner of the note is contrary to public policy and bankruptcy law policy because only the real owner has any authority to modify the loan. Also, this arrangement violates the bankruptcy court's local rule that requires a movant "to communicate in good faith regarding resolution of the motion before filing." Neither MERS, nor any Servicer, or Trustee has such ability. Only after the precise identity of the real party in interest has been proven can Movant then prove that it has actual, full and complete

---

[8] Because this law applies only to ownership transfers that occur after its enactment, it is unlikely to provide the identity of the loan owner to homeowners facing foreclosure (and lift stay motions) during the current economic crisis, because their loans were already transferred.

authority to act on behalf of the real party in interest, which is something that it must prove. If it cannot prove this, then the real party in interest must be joined as a party. If Movant can prove that it has this authority, then it must prove that the instrument is negotiable. Then it must prove that the real party in interest is a holder in due course. Then it must prove the extent to which the Debtor's obligation has not been discharged. Only after this can Movant then proceed to enter into the analyses within 11 U.S.C. § 362 and 361, which includes a discussion of Debtor's payments pursuant to the original terms of the Note and the relevance thereof. Until the above has been proven, the fact issue of Debtor's payments and the legal issue of the relevance thereof are not ripe for adjudication. It has customarily been the practice in bankruptcy court and is generally preferred in all Courts to not insist on strict application of the Rules of Evidence, in the interest of the efficient and inexpensive administration of justice. But because of the uniqueness of the current situation and the fact that fraud has and is being committed by every Movant for stay relief that comes before this Court, It has customarily been the practice in bankruptcy court and is generally preferred in all Courts to not insist on strict application of the Rules of Evidence. The Attorney filing this response can point to more than one case in which a Movant presented notes to the Court as negotiable instruments and alleging that it was a holder in due course, that was subsequently revealed to be misleading and false.

Debtor asks for Attorney fees in the event it is shown later that Movant has withheld the names of unnamed necessary parties or entities, or other information that is obviously needed in order for Movant to avoid being misleading to Debtor and to the Court, and for such other and further relief as is just. The securitization process has serious consequences for Notes and Mortgages and it is improper not to volunteer this information.

All of these consequences are based on clear UCC law, with a little hornbook common law as to mortgages mixed in. One serious consequence, but not the most important of which is that it potentially subjects the Debtor to multiple liability for the same obligation. They way the securitization of mortgage notes was set up, from the moment a note becomes part of a MBS Trust Pool, it immediately becomes non-negotiable, renders impossible that any party can be a holder in due course, and has renders it unsecured by the Debtor's home. That security has intentionally be replaced by third-party guarantees of multiples in variety and in quantity. It is with the aid of this latter form of assurance, guarantee and security by which they were often marketed and sold. Additionally, for tax purposes,[9] and for the purpose of having access to the these alluded to third party sources, there are statements made in the governing documents in the securitization processes, and in filings that took place at various times for various purposes, that deny that there is security in the form of real estate.[10] This is and was intentional and is the kind of separation of note from deed of trust that renders the obligation unsecured. Additionally, pursuant to elementary UCC law, the obligation of Debtor has likely already been discharged, as explained below, meaning Debtor no longer owes anything to anyone unsecured or otherwise. Moreover, as explained below, if there really is any obligation that Debtor owes to any party, or to multiple

_____

[9] Incidentally, the NWOGUGU paper, *Securitization is Illegal*, cited below, opines that securitization can be seen as essentially a tax evasion scheme. While this author may overlook some of the more fraudulent and lucrative aspects of securitization when making this statement, he helps to expose perhaps the main "mens rea' or "mental" element of willfulness — the specific intent to violate an actually known legal duty, necessary to show the intent to separate the notes from the deeds of trust that in turn render the obligations unsecured.

[10] Many of the tax advantages arise from the fact that MBS Pool Trusts are Real Estate Mortgage Investment Conduits ("REMICs"). REMICs cannot own property.

parties, it is likely equitable in nature, and is unsecured as a matter of law. These unsecured equitable claims would be in favor of: lower tranche certificate holders to the extent they have not been fully reimbursed; subrogation claimants such as to insurance companies, credit default swap payors, and pursuant to payments based on government guarantees; and to individuals, corporate or other business entities, or the U. S. Government, that purchased the notes, pools of notes, or interests therein from the certificate holders or from the MBS Trust Pools. In the latter case, they may have been paid full value, or may have been paid cents on the dollar.

In a typical MBS, junior tranche investors achieve a leveraged, non-recourse investment in the underlying diversified collateral portfolio, that included the deeds of trust. But why is it that they never pursue their rights against the Debtor? Because their lawyers are not stupid. They have the burden of proof, and they know that the documents they would need to prove their case, would lose their case for them. They notes are no longer negotiable. They know that they have neither the evidentiary advantages of holders in due course, nor their protections from defenses and counterclaims. And they know that the obligations have become unsecured, because there was specific intent at various stages in securitization to separate the Notes from the Deeds of Trust, and this renders the obligations unsecured as a matter of law. Once these consequences occur they cannot be undone.

To hold Debtor liable to Movant would not only be to allow Movant to succeed at fraud, but runs the risk of subjecting Debtor to multiple liabilities. Movant is not an investor, nor does Movant have the authority to act on their behalf, because the MBS Trusts were intentionally constructed so that there would never be any party with real authority to act,

not even the investors themselves. They were intentionally constructed so that the servicers would have illusory authority to act against the borrowers. Any documents presented that make it appear that Movant holds a negotiable instrument or is the owner of Debtor's obligation are fraud, plain and simple. Giving every benefit of doubt to each person employed by Movant that has acted in furtherance of the presentment of these documents to a Court of law or through the non-judicial Trustee Sale process, do so by way of intentional ignorance or misleading by silence. The Note in this case is or was securitized at some point and Movant failed to mention this fact. This far from unusual, but is the rule rather than the exception. The term "participants," refers to the participants in the securitization process and includes Originator, Seller, Depositor, Issuer or Sponsor, Underwriters, Trustee of MBS Trust, Custodian, Master and Subservicers, though not every case has each of these participants. "Investors" and "Borrowers" are not included in the definition of "Participant" as used herein, because the term as used herein refers only to those that have colluded in fraud each for their own benefit. The Borrowers and Investors are the victims. Additional victims are any party that was the ultimate payee on mortgage insurance, such as credit default swaps and the U. S. Government, who paid the participants that planned and committed the fraud in the first place. The real security for those that benefitted from the securitization scheme were the various forms of mortgage guarantees, that were generally provided for many times over for each dollar owed on the notes, and this is also the reason they were intentionally made to fail. Often a single entity, or their affiliates perform more than one function. All of the participants are in collusion. Generally, the Sponsor maintains and exercises the power to control all aspects at every

stage.[11] The Servicer is generally given tacit or express permission to attempt to enforce Debtor's obligation to pay according to the terms of the original note and to pocket the proceeds, including receipt of payments by borrower and foreclosure proceeds, which is generally ownership of the home while it attempts to find a buyer. The entire scheme is fraud. The securitization of mortgages as it has been effected over the better part of the past decade has been the greatest fraud in the history of mankind, in terms of dollar value, and most widespread, in terms of the number and unanimity of persons and entities involved. The participants "take turns" being the Master and Subservicer, but a Sponsor is not a Servicer when they are a Sponsor and they are not a Sponsor in instances where they are the Servicer. Most real parties in interest were never intended to see any of the real return on investment from payment of the Note, because if it were otherwise, the overall fraud scheme would not work. The junior tranches interest holders have been compensated by perhaps a little of the income stream from the notes, from third party sources and from the class action lawsuits they are filing against the Participants. All of the real financial benefit went, just as intended long in advance, to members of upper tranches selectively chosen because of personal or preferential relationships with the Sponsors, including series of back and forth quid pro quos arrangements consisting of multiple and seemingly unrelated other MBS Trusts. The collection and enforcement efforts by Servicers who pretend to have a real interest in the real debt and in the real documents are also a scam, which is also part of the overall fraud scheme. The Servicers have been converting

---

[11] This is stated throughout the paper, *Securitization is Illegal*, AUTHOR: MICHAEL NWOGUGU, Certified Public Accountant (Maryland, USA); B.Arch. (City College Of New York). MBA (Columbia University). Attended Suffolk Law School (Boston, USA). A free download of the paper can be obtained at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=883300.

the proceeds of mortgages and foreclosure sales to themselves, because at this point there is really no real party in interest that has not already been paid, and sometimes multiple times from 3rd party sources.

Debtor admits to signing a note and a deed of trust for purposes of security and that Debtor owed the original investor that supplied the funds that were loaned and may still owe the investor. However, neither Movant, nor any other Participant in the securitization process has suffered any financial loss relating to the loan, nor are they threatened with any future loss due to any future non-payment. Movant and the other participants received fees and profits relating to the loan up-front and far greater than they had ever traditionally made. The only party that ever risked any funds and the only ones with a legitimate right to proceeds were the "Investors," which were the purchasers of the Mortgage Backed Securities ("MBS"). The existence and identity of the real parties in interest is withheld from the public at all stages, unless a real investigation takes place, and this includes the "Borrower," which is synonymous with Debtor, and this Court. "All stages" means at all times prior to the closing of the loan, at all stages of servicing, during all Court proceedings, through foreclosure and forever after. This means that there are unnamed and undisclosed parties, and this has been severely criticized by Courts across the nation at a greatly accelerating pace as the clarity of what has been taking place increasingly unfolds. The real party in interest would only be the purchaser of certificates in the MBS Trust that the Debtor's Note became a part of. Furthermore, the notes that have been securitized have often been pledged on paper and/or electronically through multiple and competing chains of hypothetical ownership. This is all done with the specific intent that none of the investors have any real ability to obtain a real accounting of what happened to the debt created by

the investment funds that were loaned to borrowers. The same secrecy that keeps Debtors ignorant as to who they owe the money to, is that which keeps those that are owed money from knowing who owes them. The interest in the obligation, the note as evidence of the obligation, and the security interest for the obligation was transferred multiple times without recording the change in ownership of an interest in real property in the appropriate county records. This was accomplished by the creation of a private parallel record keeping service known as Mortgage Electronic Registration Systems, Inc. (also known as "MERS," or "MERSCORP"), which is named in the Deed of Trust in the loans as nominee but not as holder or lender except for the purposes of deceiving the borrower and the clerk's office where the document was to be recorded. The purpose as expressed by industry members of MERS and MERS itself is to side-step recording state requirements. The effect of the exclusive use of MERS or any private parallel system of record keeping, without complying with state law by recording appropriate documents within the county in which the subject property or property interest is located, is to create a permanent cloud on title and marketability of title; this cloud exists because of the disclosure of MERS as a parallel record keeping system but withholding the records from the state and thus notice to the world of the parties who could claim an interest in the property, the obligation, the note or the security interest. This is known to many of the Movant and the other known participants, inasmuch as they have been the recipients of memoranda from legal counsel and advisers (not protected by attorney client privilege or the attorney work product privilege) in which they have been informed that the MERS system in particular allows multiple parties to make claims on the same property from the same borrower, using the same note and the same security interest. The intended monetary effect of the use of MERS was to provide

obfuscation of profits and fees that were disclosed neither to the investor who put up the money nor to the borrower; in many if not most cases, and certainly in this loan the fees and profits generated were actually in excess of the principal stated on the note --- which is to say that investors unknowingly placed money at risk the amount of which vastly exceeded the funding on the loan to the borrower.  The only way this could be accomplished was by preventing both the borrower and the investor from accessing the true information, which is why the private MERS system was created.  There are also other similar systems in effect that do the same thing that MERS does in this regard.  The existence of a parallel and secret recording system by its very nature creates an automatic cloud on title.

The only procedure that is adequate to the task of uncovering the facts and rendering a just disposition of this matter is an adversary proceeding with complete responses to discovery.  The non-judicial remedy of foreclosure by Trustee Sales was never intended to apply to cases such as these.  When the identity of parties that have an interest, or a potential interest, in the loan are rarely volunteered without an discovery responses under penalty of perjury, or an independent investigation, such as the identity of the MBS Trust Pool; when the production of documents that provide the relevant information that identify the owners of the MBS Certificates, so that they can be placed on notice, or can prove that no one has the authority on their behalf to litigate with full settlement authority is not provided without requests for production or subpoenas; when the details of all payments made to the investors by third party sources is so difficult to obtain; when the information available to all MERS members online through the use of their user name and password that shows the electronic record of one or more supposed lines of transits of note ownership, and physical custody thereof as it makes its way to the MBS

Trust, is denied Debtor's Attorneys and the Courts without discovery; when an accounting of funds allegedly paid to purchase interests in notes is not provided without discovery; when all information and documents that can show whether or not Debtor's loan was paid, and how many times over it was paid, when the MBS was downgraded by the rating agencies, or upon it being declared in default; and when all of these questions are relevant to the Court making a correct adjudication of the parties that should be brought in to remove cloud from title, and to determine the rights of each, it is more than obvious that summary remedies are inappropriate, such as stay lifts and Trustee Sales on misleading documentation, which are moreover based on non-payment when knowledge of who to pay and how much is owed is kept secret. Securitized loans do not fall within the class of loans that state law intended the Trustee's Sale remedy to apply. Without giving notice to all potentially interested stakeholders using service of process, a non-judicial foreclosure of a securitized loan does not dispose of the matter. Since there is no procedure for service of process on other parties in a contested matter, an adversary proceeding, which among other things serves the purposes of a judicial foreclosure, an adversary proceeding is necessary. Truly Movant is the party that should be required to file the adversary proceeding in the case of a securitized mortgage, rather than by Motion. This places the burden of proof where it should rightfully be, upon the movant. The "election" of non-judicial process in such cases wrongfully may shift the burden on some issues to the borrowers in the loans to allege facts that are solely within the knowledge of the Movant, and all other known Participants, and which were intentionally withheld by them. or at a minimum more available to it.

This paragraph presents three examples that demonstrate the absolute need for

discovery before rendering a decision on the lifting of the automatic stay in cases of a securitized mortgage, as in this case. First, there have been published Financial Accounting Standards obviously intended for auditors involved in auditing and rendering opinions on the financial statements of entities involved in securitization, meant to apply to the larger originating entity, the Sponsor or Issuer, that as previously stated that explain how and why the transactions are advised to be accounted for "on the books" at times and "off the books" at other times of that are fatal to the entities currently seeking to enforce mortgages, such as the Movant in this case. Another is that often the Prospectus and/or other published documents clearly express that a securitized mortgage will treated on the books sometimes as being secured by real estate, but that are treated at other times as not being secured by real estate, depending on the context and purpose of the accounting. Accordingly, there is a clear intent at various times in the process to separate the Note from the Deed of Trust. And there are other statements in discoverable documents that demonstrate that the real security is in the form of the various insurance policies and guarantees and that there is no real interest in the real estate while attempting to influence participants and investors that the MBS is a sound investment. This can be observed also by the conduct of MBS Trustee's and the Investors, which never seek to recover against the real estate. They must be aware that the claim against the real estate is invalid. Also as evidence that the investors and those that represent them do not believe that there are viable claims available against the Borrowers is that they are not even suing the borrowers. But they may also realize that they do not have holder in due course status, that they would be subject to the risk of all the defenses, claims and counterclaims under TILA, deceptive lending, securities violations, rescission, treble damages, usury and so forth. The Investors

also demonstrate that they know that major fraud has been committed and who were some of the guilty parties, because they are filing large class action lawsuits against the participants such as the original sponsor investment banking firms, depositing banks and issuing banks that masterminded the entire process, because of fraud in the sales of the securities from the very beginning, and because even after having been caught, they continue to perpetrate ongoing fraud in furtherance of their original designs. It is as though they have no shame. None of these entities have defenses, claims or counterclaims. Many of these suits can be brought against any and all intermediate participants, because of collusion, which pursuant to RICO, makes each participant guilty of every act of every other participant.

The third example is to discover the powers and authorizations of the MBS Trustees, such as by review of the Pooling and Service Agreement. In the securitization of the loans, the rights of various named Trustees have each been superceded by succeeding trustees ending with the Trustee for the holders of mortgage backed securities, whose powers are limited to only what the certificate holders authorize. Inasmuch as the only potential party to a foreclosure wherein the Plaintiff alleges financial injury and therefore a right to collect the obligation, enforce the note or enforce the security instrument is either a party who has actually lost money or stands to lose money, which applies to neither Movant nor any known participant, or an authorized representative who can show such authority and is answerable to the claims, affirmative defenses and counterclaims of the borrowers for such causes of action or defenses as might be applicable.

Debtor has a plethora of causes of action it can present in the adversary in addition to the main purpose of the Complaint is to have the Note declared unsecured and for quiet

title.

Even if Movant can prove it is the party entitled to proceed, that it has a valid security interest and that the obligation has not been discharged, it may not do so if it is in violation of the statutory duties and obligations it contractually bound itself with the Department of the Treasury (of which the Debtors are certainly third party beneficiaries) as a condition for acceptance of government bailout funds pursuant to the Troubled Asset Relief Program ("TARP" or "TARP Funds") and/or otherwise to offer Debtor a loan modification lowering the interest rate to make the monthly payments in an amount Debtor can afford.  This program was developed, . . . "**after consultation with mortgage fraud experts at the Federal Bureau of Investigation** ("FBI"), SIGTARP made a series of fraud prevention-oriented suggestions for the design of the program. As discussed in Section 4 of this report, some of those suggestions were adopted, including a fraud warning sheet and requiring a signed certification with respect to certain **representations under criminal penalty**."[12]  The terms hereof apply to Servicers.  The Servicer for this loan appears to be America's Servicing Company "(Wells Fargo Home Mortgage Inc, dba America's Servicing Company) as servicer for US Bank National Association as Trustee for Citigroup Mortgage Loan Trust 2006-HE3.[13]  When such occurs the agreement includes provisions that cancel prepetition arrears that need to be cured under § 1322.  Payments start anew in accordance with the terms of the new agreement.

---

[12]   Office of the Special Inspector General for the Troubled Asset Relief Program (SIGTARP), *Quarterly Report to Congress*, APRIL 21, 2009 14-15.  Emphasis added.

[13]   Exhibit E is the MERS Servicer ID printout (the only available report to the public, and Exhibit F is the Making Home Affordable Program Servicer Performance Report through September 2009, which shows that ASC is a signatory.

Debtor further moves that all litigation on the primary mortgage be handled separately from the Debtor's Plan, such that Debtor's plan can be confirmed prior to the resolution of the litigation involving the mortgage. Regardless of whether Debtor wins or loses, the Plan and its terms will be unaffected.

Debtor asks for Attorney fees plus any other penalty deemed appropriate by the Court for presenting false and incomplete evidence, in the event it is shown later that Movant has withheld obviously necessary information to avoid being misleading, such as the identity of unnamed necessary parties or entities, or other information that is obviously needed in order for Movant to avoid being misleading to Debtor and to the Court, and to save Debtor's Counsel and the Court from extra work that should be unnecessary to arrive at a correct adjudication.

WHEREFORE, PREMISES CONSIDERED, Debtor and Plaintiff asks that this Court require the real party in interest to appear as a party to this proceeding, and to present strict proof that it is the real party in interest, as well as proof of all required elements as set forth above, with strict application of the Rules of Evidence, including proof of the amount of Debtor's obligation that remains undischarged, and based upon the facts of this case, either dismiss the motion or stay further action pending complete responses to discovery filed as applicable to both this Motion and the Adversary Proceeding. Debtor asks for Attorney fees plus any other penalty deemed appropriate by the Court for presenting false and incomplete evidence, in the event it is shown later that Movant has withheld obviously necessary information to avoid being misleading, such as the identity of unnamed necessary parties or entities, or other information that is obviously needed in order for Movant to avoid being misleading to Debtor and to the Court, and to save Debtor's Counsel and the Court from

extra work that should be unnecessary, and for such other and further relief as is just.

Dated, October 27, 2009.

Respectfully submitted,
/s/ Ronald Ryan
Ronald Ryan

CERTIFICATE OF SERVICE

I certify that on October 27, 2009, a true copy of the forgoing was emailed to: Attorneys for U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR CITIGROUP MORTGAGE LOAN TRUST 2006-HE3, MOVANT, Leonard McDonald, Tiffany & Bosco; Chapter 13 Trustee; and Debtor.

/s/ Ronald Ryan
Ronald Ryan